325 So.2d 546

**Cleven DIXON**

v.

**STATE.**

**I Div. 537.**

Court of Criminal Appeals of Alabama.

Oct. 21, 1975.

Rehearing Denied Nov. 18, 1975.

David L. Barnett, Mobile, for appellant.

William J. Baxley, Atty. Gen., and Kermit M. Downs, Asst. Atty. Gen., for the State.

HARRIS, Judge.

Appellant was put to trial upon an indictment which, omitting the formal parts, reads as follows:

"The GRAND JURY of said County charge, that, before the finding of this indictment CLEVEN DIXON whose name is to the Grand Jury otherwise unknown than as stated, did unlawfully assault Joseph Harry Puckett, a law enforcement officer of the Police Department of the City of Mobile, Alabama, a political subdivision of the State of Alabama, with a shotgun, a deadly instrument, while said officer was engaged in the active discharge of his lawful duties, against the peace and dignity of the State of Alabama."

Prior to arraignment appellant was found to be indigent and counsel was appointed to represent him and he pleaded not guilty and reserved the right to file special pleas within twenty days. New counsel appeared on behalf of appellant and added the plea of not guilty by reason of insanity. The jury returned a verdict of guilty as charged in the indictment and the court adjudged him guilty and sentenced him to fifteen years imprisonment in the penitentiary. He gave notice of appeal and was furnished a free transcript and trial counsel was appointed to represent him on this appeal.

The evidence for the state and appellant was in sharp conflict and only a jury could unscramble these conflicts and arrive at a verdict.

Police Officer Joseph Harry Puckett had been with the Mobile Police Department for four years prior to January 12, 1974. He worked the night shift and was alone in a patrol car when he got a radio dispatch to go to Ghent Street where a domestic quarrel of mammoth proportions was taking place. He was dressed in his police uniform. Police Officer Percy Watkins was dispatched to the scene as a "back-up" officer for Puckett.

When Officer Puckett arrived at the Ghent Street address, he was met by a young black female and he had a conversation with her. She ran out to his car before he could stop and said, "Oh, my God." She told him what was happening inside the house and she carried him in the house. She stopped at the entrance to the hall in the living room and he heard someone arguing. He had his night stick in his right hand and his service pistol was in his holster. He walked down the hall and stopped in front of a bedroom door. He looked in the bedroom and saw a Negro woman standing there and a Negro man had a shotgun sticking in her ear. The officer said, "You don't want to shoot that lady. She has probably been married to you a long time." The officer still had his night stick in his right hand.

The Negro male said, "No you ——— ———, I don't want to shoot her, I want

to shoot you." At that time the man turned toward the officer with the shotgun. The officer swapped hands with his night stick and drew his revolver and dived to the right of the door.

From the record:

"Q. To this side?

"A. Right here, right to this point right here and, I fired three shots into this door with my hand turned back around like this, around the door, attempting to shoot away from the female, or, him either, I was trying to scare him into dropping the gun. As my third shot was fired, a shot came from inside the room simultaneously with my third shot and blew my hand off. Then, I ran into this back bedroom. I don't remember what I pushed, but, I pushed something in the way, here, to keep anybody from following me. I don't know what it was. And, I heard a voice, a male voice say, I have got that son of a bitch now. I will finish him off.

There was a window in the rear of the room. I decided the only exit from that room would be through the window. So, I ran and jumped on the bed and dove through this window. Just as I dove through the window, I was shot in the hip, then, from the back. And, I fell to the ground right here.

"Q. Joe, did you have a pistol from the time you left here and got to right there?

"A. No, I did not. My pistol was blown back up behind a heater on the other end of the hall, near the living room. It was knocked out of my hand with the first shot.

"Q. Now, as you got on the ground, right here, did you hear anything else, anything said from inside that house?

"A. I did, sir.

"Q. What did you hear?

"A. I heard a male voice say I have got him for sure. Now I am going to finish him off.

"Q. What did you do?

"A. A crawled to approximately—I believe it was right in here. I remember seeing the porch where I was laying. This was as far as I could crawl, then, I just flipped over on my back and I could see what was transpiring in the house.

"Q. Do you see the individual that shot you with the shotgun in this courtroom?

"A. I do.

"Q. Where is he?

"A. He is sitting in the defendant's chair over there.

"Q. The man in the blue shirt?

"A. That is right."

Over objections of appellant the officer testified that he stayed in the hospital over six months and that his leg was paralyzed and only had two fingers and a thumb left on his right hand.

The officer further testified that after he crawled around the house, he saw appellant come to the front door and he had the shotgun with him, but he didn't come out of the house. Some parts of the injured officer's uniform were cut off him at the scene of the shooting and he identified his uniform and it was admitted in evidence without objection.

Police Officer Percy Watkins testified that he got to the scene of the shooting about a minute after it was over and found Officer Puckett lying on the steps of the porch and he was bleeding. He went to his car and called for more help and then went to see if he could help Officer Puckett. At this time appellant's wife walked up and talked to him and went back in the house. She came out of the house with a shotgun and put it out in the yard. Appellant's wife went back in the house with

Officer Watkins to get appellant. Appellant was found in one of the back bedrooms and the door was locked. When appellant unlocked the door, he came out in his undershirt and shorts. He smelled of the odor of alcohol but the officer said he was not drunk. The officer carried him to another bedroom and let him put on a pair of pants and a shirt but no shoes. He put him in his patrol car and carried him to the docket room of the station house and left him. In the bedroom where appellant was locked up the officer found a shotgun case lying on the bed.

Officer Ronald Stevens Myers worked in the identification division of the Mobile Police Department. He was on call at his home and received a call to go to 1211 Ghent Street, Apartment A, at 1:40 a. m. on January 12, 1974. He arrived at 1:55 a.m. He testified he saw blood on the floor and several other items of evidence. He made photographs of the entire scene of the shooting which were admitted in evidence without objections.

He further testified that he found three bullet holes in a door that swings inward. He found a spent shotgun shell on the floor of this bedroom. It was buckshot and was a twelve gauge Winchester shotgun shell. In the hallway that goes into the back bedroom, he found another spent shotgun shell.

From the record:

"Q. Now, did you have an opportunity to look at this bedroom at all?

"A. Yes, I photographed this room first, the hallway. Then, I entered this bedroom and photographed this window here, and this bed.

"Q. What did this window look like?

"A. This window, on the farthest side, the last window on the end, at the end of the apartment, had been knocked out. The curtain had a pattern of shotgun pellets through it. The window had been knocked out, and, there was blood all over the floor and bed, and the policeman's cap was laying in this position, here.

"Q. Did you have an opportunity to see if there was a service revolver in this house at all?

"A. Yes, I did.

"Q. Would you mark that?

"A. Yes. There was a heater in the living room area and a red rug in this position. There was a three fifty seven nickel plated magnum here, and the butt of the revolver was over here.

"Q. And, this is the window that was blown out?

"A. Yes, it was."

This witness identified all of the photographs that he took at the scene of the shooting. He described the window in the last bedroom. He said the wood frame and all the glass was knocked outward and the curtains were bloodstained and the curtains had a buckshot pattern. He found a night stick just under this window. This night stick, the shotgun, and Puckett's broken pistol were all admitted in evidence. At the foot of the bed he found Puckett's hat on the floor. This witness further testified that he found 35 live shotgun shells in the house and the shotgun had three live shells in it. He stated there was a hole under the window that was broken out. He dug the object out of the hole and it was a buckshot.

Appellant testified that he had been to a "union" party with his wife's family and they got home about 1:00 a. m. He had planned to go deer hunting at 3:00 a. m. He loaded his gun and put it behind the door in his bedroom and put the gun case on his bed. He and his wife got into an argument in his bedroom and he told her to go to her room and let him alone. She refused to go so he pushed her out and put the ironing board against the door to keep her from coming back in his room. He

# 34

then went to sleep and fifteen or twenty minutes later the officer kicked his door in. That he told the officer not to shoot but he did. That three shots were fired at him and he picked up his shotgun, reached with it around the door and returned the fire. After that he went around the corner and shot at the rustling curtain on the window in the next room. He stated that he did not know anyone had called the police.

On cross-examination he testified that after he shot the first time, the officer didn't fire at him any more. He further stated that he was angry when he was shooting. He denied making the statements that Officer Puckett testified that appellant said before and after the shooting.

Appellant offered the testimony of several character witnesses who testified that he had a good reputation and that they would believe him on oath.

It should be noted here that appellant did not call his wife and daughter to testify in his behalf. Their testimony, no doubt, would have been most damaging to his defense. It can be fairly inferred that his daughter called the police because her father was pointing a shotgun at the head of her mother as testified by Officer Puckett.

█ In a prosecution for assault it is relevant to show the extent of the wounds as part of the res gestae and the duration of the recovery as tending to prove the severity of the wounds and the intent with which they were inflicted. *Phillips v. State,* 170 Ala. 111, 54 So. 111; *Bailey v. State,* 24 Ala.App. 339, 135 So. 407; *Jackson v. State,* 19 Ala.App. 339, 97 So. 260.

In *Phillips v. State,* supra, the Supreme Court said:

"The evidence as to the character of the wound was admissible to show the intent accompanying the assault. *Brown v.*

*State,* 142 Ala. 294, 38 So. 268; *Meridith [Meredith] v. State,* 60 Ala. 441; *Jackson v. State,* 94 Ala. 85, 10 So. 509. The condition of the assaulted party, resulting from the assault, was but a method of showing the nature and extent of the assault and the injury therefrom, and these things were of the res gestae of the offense charged. *Phillips v. State,* 161 Ala. 60, 49 So. 794. Nor was there error, upon the part of the trial court, in refusing to confine this evidence to merely showing the 'fierceness' of the attack. The assault may have been mildly committed, but with a murderous intent and may have produced disastrous results. The assault may not have been 'fiercely' made, yet could have produced such dangerous results as to afford an inference for the jury that it was made with the intent to murder."

Appellant claims that the court's oral charge to the jury was improper as it *implied* that the burden was on the defendant to prove his plea of self defense. We do not agree.

We have read and re-read the oral charge in this case and nowhere in this charge did the court tell the jury that the burden of proving self defense rested on the defendant. The court charged the jury that the "burden never shifts from the state in any criminal prosecution. The burden is on the state to satisfy you from the evidence beyond a reasonable doubt that the defendant was guilty. The burden is never upon the defendant to prove his innocence or disprove the facts of the crime of which he is charged. The burden never shifts from the state to prove all necessary elements of the case. In all criminal cases, if the evidence or any part of it, after considering it all, leaves in the mind of the jury any reasonable doubt of the defendant's guilt, he should be acquitted. It is incumbent upon the defendant to establish his plea of self defense if the evidence for the state does not establish it for him. *But he meets the legal requirements*

*if the evidence creates a reasonable doubt as to whether or not he acted in self defense. If, therefore, there is a reasonable doubt of the defendant's guilt, whether arising from self defense or other facts in the case, the defendant is entitled to an acquittal."* (Emphasis added).

■ It is settled law in this state that the only burden resting on the defendant under his plea of self defense is to offer such evidence as will, when considered with the whole evidence, generate in the minds of the jury a reasonable doubt of guilt. *Stowe v. State*, 49 Ala.App. 13, 268 So.2d 45; *Lester v. State*, 40 Ala.App. 503, 121 So.2d 107; Certiorari denied (but with approving opinion) 270 Ala. 631, 121 So.2d 110.

■ It seems clear to us that at no point in the oral charge did the judge *imply* that the burden of proof rested on the defendant to prove his plea of self defense.

In *Young v. State*, 283 Ala. 676, 220 So. 2d 843, the Supreme Court held:

"Where the evidence presented raises questions of fact for the jury, and such evidence, if believed, is sufficient to sustain conviction, the denial of a motion to exclude the state's evidence, the refusal to give the affirmative charge and the overruling of a motion for new trial, does not constitute error. *Drummond v. State*, 37 Ala.App. 308, 67 So.2d 280; *Wade v. State*, 24 Ala.App. 176, 132 So. 71."

The judgment of conviction is affirmed.

Affirmed.

All the Judges concur.